### RECURSION SOFTWARE, INC., Plaintiff,

v.

### INTERACTIVE INTELLIGENCE, INC., Defendant.

### No. CIV.A. 3:03–CV–2711–.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 27, 2006.

Order Denying Reconsideration,
Mar. 13, 2006.

Andrew R. Korn, David M. Diaz, John W. Bowdich, II, Korn Bowdich & Diaz, Dallas, TX, for Plaintiff.

Constance R. Lindman, Paul B. Overhauser, Overhauser Law Offices, Greenfield, IN, Derek D. Rollins, Michael D. McKinley, Shackelford Melton & McKinley, Dallas, TX, for Defendant.

## MEMORANDUM ORDER

BOYLE, District Judge.

The following papers are before the Court: 1) Defendant Interactive Intelligence, Inc.'s ("Interactive") Motion for Summary Judgment (doc. 81); 2) Plaintiff Recursion Software's ("Recursion") Motion for Summary Judgment (doc.85); 3) Plaintiff's Motion to Strike the Statement of Scott Ganyo (doc. 104); 4) Plaintiff's Objections to Defendant's Summary Judgment Evidence (doc. 126); and 5) Defendant's Motion to Strike Portions of Plaintiff's Supplemental Appendix (doc. 129). For the reasons that follow, the Court GRANTS Interactive's Motion for Summary Judgment in part and DENIES it in part; GRANTS Recursion's Motion for Summary Judgment in part and DENIES it in part; and, to the extent not stated otherwise in this order, OVERRULES the parties' objections to evidence and DENIES their motions to strike certain items of summary judgment evidence.

### I. Factual and Procedural Background

Recursion and Interactive are both software companies. This lawsuit arises out of Recursion's charge that Interactive made improper use of a Recursion software program—Voyager [1]—that Recursion

---

1. According to Recursion, Voyager is a "full-blown Java ORB architecture designed to support the development of powerful distributed computing systems." (Pl.'s Sec. Am. Compl. at ¶ 7).

had purchased from the program's developer, Objectspace, Inc. (Pl.'s App. in Supp. Mot. Summ. J. ["Pl.App."] 1–2, 6–40). According to Interactive, well before Recursion acquired any interest in the Voyager software, certain Objectspace representatives told Scott Ganyo, an Interactive software developer, that Interactive could use Voyager in its own products free of charge provided that the software was not "embedded" in "devices" or "hardware". (Def.'s App. in Supp. Mot. Summ. J. ["Def.App."] 5–7, 13, 16, 30). Various public pronouncements by Objectspace also indicated that use of the Voyager technology would be free for most commercial uses. (See e.g. Def.App. 5, 13–15, 16–20, 33–44).

Interactive asserts that, according to company policy, it does not use software development tools in its own software programs if the use of such tools would require it to pay royalties on the software it sells. (Def.App.44). Interactive claims that it relied on Objectspace's representations that it could include Voyager in its software programs free of charge in deciding to incorporate components of the Voyager program into one of its products called "Interaction Recorder"[2], which Interactive sold to the public. (Def.App.8, 43–44). While Interactive contends that only a fractionally small part of Voyager is incorporated in Interaction Recorder, and

that Voyager plays only a small role in the functioning of the program, Ganyo has testified that the operability of the system would be "seriously degraded" without Voyager. (Def.App. 8, 41; Pl.App. 147).

Although it is unclear exactly which versions of Voyager were included in Interaction Recorder, and when each version was included (Pl.App.148, 200)[3], it is undisputed that Interaction Recorder at some point incorporated elements of Voyager 2.0.1. (Pl.App.200). The license agreement to that version of Voyager prohibits the licensee from embedding Voyager in "hardware" and in software programs that are marketed and sold. (Pl.App.86–87). The license agreement further imposed an obligation upon the licensee to "take all necessary steps" to ensure that those under its "control" and in its "service" do not violate the terms of the license agreement. (Id.).

According to Recursion, Interactive would not have been able to download Voyager without agreeing to the terms of the license agreement. (Pl.App.90). Recursion alleges that Interactive breached those terms by including parts of Voyager in the Interaction Recorder software that it marketed and sold, and by permitting its resellers to package Interaction Recorder in "hardware". Interactive denies that it ever agreed to the terms of the license agreement to Voyager 2.0.1. Rather, In-

---

**2.** According to Interactive, Interaction Recorder is an "optional add-on software module to Interactive's flagship products[.]" (Def.'s Mot. Summ. J. Brief at 6; Def.App. 42).

**3.** John Sheley, an Interactive software developer, states that Interactive began selling Interaction Recorder, which included Voyager, in February 1998. (Def.App.41). Recursion objects to this testimony on the ground that Sheley, an interested witness, contradicted his statement at his deposition. (Pl.'s Obj. to Def.'s Summ. J. Evid. at 12). There Sheley testified that, to his knowledge, Voyager 2.0.1

was the only version of Voyager that has been used in Interaction Recorder. (Pl.App.200). Recursion claims that Voyager 2.0.1 was released on December 23, 1998. (Pl.App.195). The Court sees no inherent contradiction. Sheley did not unqualifiedly testify that Voyager 2.0.1 was the *only* version of Voyager *ever* used in Interaction Recorder, only that it was the only version that he could say was included, based on his personal knowledge. In fact, Sheley testified that an earlier version of Voyager could have been included on an earlier version of Interaction Recorder, but that he had no "direct knowledge of that." (Pl.App. at 200).

teractive claims that it was included on a "grandfathered" list of Voyager users who could download updates to the software (necessarily including Voyager 2.0.1) in perpetuity without having to comply with the corresponding license agreements to those updates.

In 2001, Recursion acquired rights to the Voyager software from Objectspace.[4] (Pl.App.1–2). Recursion contends that it first learned of Interactive's use of the Voyager software in March 2003, when Interactive sought technical support from Recursion for a "bug" in Interaction Recorder believed to have been caused by Voyager. (Pl.App.2, 88). Recursion responded by sending a letter to Interactive on July 20, 2003, demanding the immediate return of all products containing Voyager and that Interactive stop distributing such products. (Pl.'s Supplemental App. in Supp. Resp. to Def.'s Mot. Summ. J. ["Pl. Supp.App."] 514–17). In response, Interactive told Recursion that it had been given express permission from Objectspace to use the software. (Def.'s Mot. Summ. J. Brief at 9). Recursion then filed this lawsuit.

Recursion asserts claims against Interactive for copyright violations, breach of contract, unjust enrichment and quantum meruit, all arising out of Interactive's use of the Voyager software. For its part Interactive contends that Objectspace promised that it could use the program in its software free of charge so long as it was not embedded in devices or hardware. Because Recursion is now seeking payment for Interactive's use of Voyager pursuant to certain license agreements, Interactive has asserted counterclaims against Recursion, alleging that it was fraudulently induced by Objectspace to enter into those license agreements and that, addi-

tionally, the Voyager program failed to operate properly in breach of implied warranties. The parties have filed cross motions for summary judgment, as well as objections to evidence. These motions and objections are ripe for review and determination.

## II. Summary Judgment Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only disputes about material facts will preclude the granting of summary judgment. *Id.*

The burden is on the summary judgment movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir.1990). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.; Little*, 37 F.3d at 1075.

Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "This burden is not

---

4. Interactive alleges that Recursion acquired the assets of Objectspace through the fraudulent machinations of Paul Lipari, Objects-

pace's former Chief Financial Officer and the founder and current President of Recursion. (Def.'s Mot. Summ. J. Brief at 1 & n. 1).

satisfied with 'some metaphysical doubt as to material facts,' ... by 'conclusory allegations,' ... by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (emphasis in original) (quoting FED. R. CIV. P. 56(e)). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## III. Analysis

### A. Interactive's Motion for Summary Judgment

#### 1. *Copyright Preemption*

 Interactive first argues that Recursion's state law claims for breach of contract, unjust enrichment, and quantum meruit are preempted by the federal Copyright Act. The Copyright Act generally preempts state law claims that are equivalent to any of the exclusive rights created by the copyright law. 17 U.S.C. § 301(a). In determining whether a state law claim is preempted by federal copyright law, the Court applies a two-part test. *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir.2003). First, the Court examines whether the claim falls within the subject matter of copyright. *Id.* A claim involving computer software clearly does. *See Nat'l Car Rental v. Computer Assoc.*, 991 F.2d 426, 431 (8th Cir.1993);

*Microsource, Inc. v. Superior Signs, Inc.*, 1998 WL 119537, at *2 (N.D.Tex. March 9, 1998). Next, the Court looks to whether the state law cause of action protects rights that are "equivalent" to any of the exclusive rights protected by copyright, which include the right to reproduce, distribute, perform, and display the copyrighted work. *Carson*, 344 F.3d at 456; 17 U.S.C. § 106. A state-created right is equivalent to these rights "if the mere act of reproduction, distribution, or display infringes it." *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir.1990) (appendix). In other words, a state claim is equivalent if it involves "elements that would not establish qualitatively different conduct by the defendant[ ] than the elements for an action under the Copyright Act." *Daboub v. Gibbons*, 42 F.3d 285, 290 (5th Cir.1995) (quoting *Quincy Cablesystems Inc. v. Sully's Bar, Inc.*, 650 F.Supp. 838, 850 (D.Mass.1986)).

#### a. *Breach of Contract*

 The Court begins by examining whether Recursion's breach of contract claim protects rights equivalent to those protected by copyright. But before doing so, it is necessary to sort out the parameters of that claim. In support of its preemption argument, Interactive incorporates the arguments previously raised in its motion to dismiss.[5] That motion was directed at the state law claims asserted in Recursion's First Amended Complaint, which has since been superseded by the filing of its Second Amended Complaint. Both versions of the complaint state that Objectspace offered Voyager software in accordance with the terms of the applicable license agreement, with which one had to agree to be able to download the soft-

---

**5.** Interactive filed a motion to dismiss on May 27, 2004. On April 14, 2005, the Court denied that motion as moot because Interactive expressly incorporated the arguments raised in its motion to dismiss in its motion for summary judgment.

ware. The complaint further alleges that Interactive downloaded Voyager and used it in its Interaction Recorder program. (Pl.'s First Am. Compl. at ¶ 17; Pl.'s Sec. Am. Compl. at ¶ 21). The Second Amended Complaint—the live pleading in this case—makes the following additional allegation: that "Defendant also permitted its agents, including its distributors, resellers and value added resellers, to market or sell Interaction Recorder and to package Interaction Recorder with the sale of hardware or embed Interaction Recorder in hardware." (Pl.'s Sec. Am. Compl. at ¶ 21).

The "contracts" underlying Recursion's breach of contract claim are the various license agreements that applied to different versions of Voyager. To say the least, the record is unclear as to which particular versions Interactive actually incorporated into Interaction Recorder and when it did so. Some evidence suggests that at some point it used Voyager 1.0.1. (Pl.App.126). It is undisputed, however, that Voyager 2.0.1 was used. (Pl.App.200).

*All* relevant Voyager license agreements shared the following same provision:

> By downloading, using or copying Voyager(tm) or any portion thereof, Licensee agrees to abide by the intellectual property laws and all other applicable laws of the United States of America, and to all of the terms and conditions of this Agreement, and agrees to take all necessary steps to ensure that the terms and conditions of this Agreement are not violated by any person or entity under the Licensee's control or in the Licensee's service.

(Pl.App.2, 82–87).

The license agreement for Voyager 1.0.1 provided that:

> Licensee may use Voyager(tm) internally for any purposes and in any systems provided that any distribution, sale or license of systems including Voyager(tm)

or developed using Voyager (tm) to third parties are restricted as stated in this agreement. Licensee may develop and distribute to third parties applications using Voyager(tm) that execute on general purpose computing platforms except as restricted below. Specifically, Licensee may distribute binaries (.class files) derived from or contained within Voyager(tm) ("Binaries") provided that:

> . . . . .

> 3. The Binaries are not packaged with, or embedded in, hardware.

(Pl.App.82). And, in addition to the foregoing limitations, the license agreement for Voyager 2.0.1 provided that Voyager's binaries could not be "packaged with, embedded in, distributed as part of, or publicly associated with any software that is marketed and sold." (Pl.App.87).

Recursion's brief of contract claim is essentially twofold. First, it asserts that Interactive violated the license agreement to Voyager 2.0.1 by downloading the Voyager software and using, or "embedding", it in its Interaction Recorder program, which in turn was marketed and sold. And second, Recursion complains that Interactive violated the license agreements to Voyager versions 1.0.1 and/or 2.0.1 by permitting resellers within its service and/or control to violate the terms of the applicable license agreement by embedding Voyager in "hardware" and/or by selling or marketing Interaction Recorder. Interactive does not appear to dispute that the latter allegation is not preempted by the Copyright Act, as copyright law does not impose upon Interactive an independent obligation to police the actions of third parties. Interactive argues, however, that Recursion's contract claim is preempted by copyright law insofar as it is based solely on Interactive's distribution of Voyager.

Though Interactive casts Recursion's first contract claim as being based solely on the distribution of Voyager, the nature of that claim as alleged by Recursion is somewhat different. That is, Recursion's breach of contract claim does not concern itself with Interactive's mere distribution of Voyager, but rather that Interactive downloaded that program, incorporated it in its software (Interaction Recorder), and then offered Interaction Recorder for sale to the public. (Pl.'s Sec. Am. Compl. at ¶ 21). The license agreement to Voyager 2.0.1 actually allows Interactive to do things which would, in the absence of the agreement, constitute copyright infringement. For example, the agreement permits Interactive to distribute applications using Voyager "that execute on general purpose computing platforms" and further allows for the distribution of binaries derived from or embodied within Voyager so long as the binaries are not: distributed as part of a competing class library; distributed as part of certain software technology; documented in any distributed materials; embedded in hardware; or "packaged with, embedded in, distributed as part of, or publicly associated with any software that is marketed or sold." (Pl.App. at 86–87).

Thus, a licensee's distribution of Voyager (or elements of it), would, under certain circumstances, be allowable under the license agreement, whereas *any* distribution of the software "by sale or other transfer of ownership, or by rental, lease, or lending" would violate the Copyright Act. 17 U.S.C. § 106(3); *see Taquino*, 893 F.2d at 1501 (state claim is equivalent to rights granted by copyright if "the mere act of reproduction, distribution, or display infringes it."). Here it is Interactive's conduct of embedding the Voyager program into software that is sold, not the naked distribution of it, that allegedly invades Recursion's private contract rights. *See Microsource*, 1998 WL 119537, at *2 (con-

cluding that claim under license agreement not preempted where it alleged a breach of personal rights under a contract). The scope of a licensee's permissible distribution of Voyager is determined by reference to the contract itself, not the copyright law. The Court thus finds that Recursion's contract claim is not equivalent to the exclusive rights of copyright and is accordingly not preempted.

The Court notes that a majority of courts have found that breach of contract claims escape the preemptive reach of the Copyright Act. *See e.g. Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir.2005) ("Most courts have held that the Copyright Act does not preempt the enforcement of contractual rights.") (emphasis in original); *Bowers v. Baystate Technologies, Inc.*, 320 F.3d 1317, 1324 (Fed. Cir.2003) ("most courts ... have found that the Copyright Act does not preempt contractual constraints on copyrighted articles"); *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 431 (8th Cir.1993) (finding that contractual limitations on the *use* of licensed software programs constituted an "extra element" qualitatively differentiating contract claim from copyright claim); *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir. 1996) (concluding that breach of contract claim arising out of consumer's use of software in violation of shrinkwrap license agreement was not preempted by copyright).

In *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir.1990), Teledyne brought a breach of contract claim against Taquino, its former agent, for breaching a contract promise to discontinue the use of Teledyne's advertising materials upon his termination from the company. *Id.* at 1490, 1494. The district court held that the breach of contract claim was not equivalent to a copyright

claim, and hence not preempted, because it "involved an element in addition to mere reproduction, distribution, or display: the contract promise made by Taquino[.]" *Id.* at 1501. The Fifth Circuit affirmed the district court's conclusion that Taquino had breached the contract. *Id.* at 1490. The "carefully considered and thorough" opinion of the district court was attached as an appendix. *Id.* at 1490–91.

*Taquino* has been cited by other courts as support for the proposition that state law breach of contract claims can *never* be preempted by copyright because they necessarily involve the additional element of a promise to perform the contract. *See e.g. Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 457 (6th Cir.2001); *ProCD, Inc.,* 86 F.3d at 1454 [6]; *Architectronics, Inc. v. Control Sys., Inc.,* 935 F.Supp. 425, 438 (S.D.N.Y.1996); *Kabehie v. Zoland,* 102 Cal.App.4th 513, 525, 125 Cal.Rptr.2d 721 (2002); *see also eScholar, LLC v. Otis Educ. Sys., Inc.,* 387 F.Supp.2d 329, 332 (S.D.N.Y.2005) (noting a division in the district courts of the Second Circuit on the issue of "whether the promise inherent in any agreement, by itself, provides the extra element necessary to make a breach of contract claim qualitatively different from a copyright infringement claim."). That proposition has been criticized by courts as an elevation of form over substance. Can, for example, a breach of contract claim arising out of a bare promise not to reproduce or distribute copies of a copyrighted work be said to be *qualitatively* different

from a copyright infringement action for the violation of the exclusive rights of reproduction and distribution granted to the copyright holder by 17 U.S.C. § 106? *See e.g. Wrench,* 256 F.3d at 457 ("Under that rationale, a contract which consisted only of a promise not to reproduce the copyrighted work would survive preemption even though it was limited to one of the exclusive rights enumerated in 17 U.S.C. § 106."); *Kabehie,* 102 Cal.App.4th at 526, 125 Cal.Rptr.2d 721 ("If the promise was simply to refrain from copying the material or infringe the rights protected by copyright, then the promisor has promised nothing more than that which was already required under federal copyright law."). In such a case the "mere act" of reproduction or distribution would seem to infringe the state-created right.

At least one federal court in the Fifth Circuit has held that a contract claim *can* be preempted only insofar as it is based on "the same types of allegations that would support a claim of copyright infringement." *Tavormina v. Evening Star Prods., Inc.,* 10 F.Supp.2d 729, 734 (S.D.Tex.1998) (finding plaintiffs' contract claim preempted to the extent it was based on defendants' display of plaintiffs' house in film). Other courts have found no preemption, relying on *Taquino* for the proposition that the contract promise constitutes an additional element distinguishing a contract claim from a copyright claim. *See Dorsey v. Money Mack Music, Inc.,* 304 F.Supp.2d 858, 864 (E.D.La.2003) ("This

---

**6.** The *ProCD* Court emphasized the distinction between personal rights and rights created by federal law:

> Rights "equivalent to any of the exclusive rights within the general scope of copyright" are rights established by law—rights that restrict the options of persons who are strangers to the author. Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or perform the work gets permission; silence

means a ban on copying. A copyright is a right against the world. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create "exclusive rights."

*ProCD, Inc.,* 86 F.3d at 1454. However, the court declined to embrace a blanket rule that anything labeled a "contract" necessarily escapes preemption. *Id.* at 1455 ("the variations and possibilities are too numerous to foresee.").

circuit has consistently recognized that a legitimate breach of contract allegation serves to defeat preemption."); *Butler v. Cont'l Airlines, Inc.*, 2001 WL 1509545, at *3 (S.D.Tex. Nov.19, 2001) ("[B]reach of contract and breach of fiduciary duty claims contain an extra element that defeat preemption under section 301."). This Court, however, under these facts, need not ·decide whether Recursion's contract claims survive copyright preemption simply because they sound in contract. As discussed above, the Court has found that the license agreement to Voyager 2.0.1 involves rights and obligations that render Recursion's breach of contract claim qualitatively different in kind from a copyright infringement claim.

b. *The Quasi–Contractual Claims: Unjust Enrichment and Quantum Meruit*

■ Quasi-contractual claims such as those for unjust enrichment and quantum meruit are based on the absence of an express agreement. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). Under Texas law, a claim for unjust enrichment lies when one has obtained a benefit from another by fraud, duress, or the taking of undue advantage. *First Union Nat'l Bank v. Richmont Cap. Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex.App.—Dallas 2005, no pet.). And a quantum meruit theory is based on an implied agreement to pay for benefits received. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992). "Generally, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory because parties should be bound by their express agreements." *First Union Nat'l Bank*, 168 S.W.3d at 931 (citing *Fortune*, 52 S.W.3d at 683).

■ The Court recognizes that Recursion's breach of contract and quasi-contractual theories are pleaded in the alternative and that, ordinarily, claims in quasi-contract should not be dismissed until the existence of a valid contract governing the parties' relationship has been established—a matter that the parties hotly dispute. *See Infowise Solutions, Inc. v. Microstrategy, Inc.*, 2005 WL 2445436, at *7 & n. 12 (N.D.Tex. Sept.29, 2005). Here, however, there are no circumstances under which Recursion's quasi-contractual claims can remain viable. If Recursion succeeds in establishing that the license agreements governed the parties' rights and obligations, then there can be no equitable claims under Texas law. *See Becker v. Nat'l Educ. Training Group, Inc.*, 2002 WL 31255021, at *4 (N.D.Tex. Oct.7, 2002) (holding that unjust enrichment claim must fall in light of express contract); *Iron Mountain Bison Ranch, Inc. v. Easley Trailer Mfg., Inc.*, 42 S.W.3d 149, 160 (Tex.App.—Amarillo 2000, no pet.) ("[A] plaintiff who seeks to recover the reasonable value of services render or material supplied will be precluded from recovering in quantum meruit if there is an express contract covering those services or materials."); *Video Pipeline, Inc. v. Buena Vista Home Entm't*, 210 F.Supp.2d 552, 568 (D.N.J.2002 ) (noting "the limited viability of an unjust enrichment claim, by nature a quasi-contractual action, which is brought in the face of an express contract[.]"). On the other hand, should Recursion fail to demonstrate that valid contracts govern the parties' relationship, its quasi-contractual claims would still fail because, as discussed below, they are preempted by copyright. *See Netzer v. Continuity Graphic Assocs., Inc.*, 963 F.Supp. 1308, 1321–22 (S.D.N.Y.1997) (finding that quasi contract claim was barred to the extent valid contract governing exploitation of copyrighted work existed, and that, even assuming no valid contract existed, unjust enrichment

claim was preempted by copyright); *Cf. Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 351 F.Supp.2d 436, 446 (M.D.N.C.2005) (declining to consider whether unjust enrichment claim was preempted by copyright because under the governing law "a claim for unjust enrichment may not be brought in the face of an express contractual relationship between the parties.").

Courts generally find that claims for unjust enrichment and quantum meruit are preempted by the Copyright Act to the extent they are based on a defendant's violation of an exclusive right protected by the copyright law. *See Asunto v. Shoup*, 132 F.Supp.2d 445, 453 (E.D.La.2000) ("Claims for unjust enrichment usually are held to be pre-empted by the Copyright Act."); *Flaherty v. Filardi*, 388 F.Supp.2d 274, 290 (S.D.N.Y.2005) (finding unjust enrichment and quantum meruit claims preempted "to the extent they address precisely the same issues as [plaintiff's] copyright claims[.]"); *Video Pipeline*, 210 F.Supp.2d at 567 ("Courts have generally concluded that the theory of unjust enrichment protects rights that are essentially 'equivalent' to rights protected by the Copyright Act; thus, unjust enrichment claims relating to the use of copyrighted material are generally preempted.").

Here, the thrust behind Recursion's quasi-contractual claims is that Interactive exploited the Voyager software, and allowed others to do so, without paying for it. (Pl.'s Sec. Am. Compl. at ¶¶ 25, 29). For this conduct Recursion seeks as damages the value of its license fees arising from Interactive's unauthorized use. (*Id.* at ¶¶ 27, 31). In the absence of a contract between the parties, the only possible source entitling Recursion to enforce its quasi-contractual claims is the Copyright Act. Because the rights Recursion seeks to vindicate through its equitable claims are equivalent to those protected by copyright,

the Court finds that they are preempted. *See Tingley Sys., Inc. v. CSC Consulting, Inc.*, 152 F.Supp.2d 95, 111–12 (D.Mass. 2001) ("[P]laintiff's claim, which alleges the wrongful acquisition and use of [its] software and demands compensation for such use and for the conferred benefits, does not qualitatively differ from a copyright infringement claim."); *Netzer*, 963 F.Supp. at 1322 (stating that any "enrichment" of the defendants resulting from the exploitation of copyrighted work was "unjust" only by reason of rights created by federal copyright law); *Am. Movie Classics Co. v. Turner Entm't Co.*, 922 F.Supp. 926, 934 (S.D.N.Y.1996) (unjust enrichment claim based on unauthorized exhibition of motions pictures preempted). The Court thus finds that Recursion's quasi-contractual claims of unjust enrichment and quantum meruit must be dismissed.

### 2. Interactive's Affirmative Defenses of Laches, Estoppel, and Waiver

#### a. Laches

Interactive next seeks summary judgment on its affirmative defenses of laches, estoppel, and waiver. "Laches is an affirmative defense based on a plaintiff's inexcusable delay that results in prejudice to the defendant." *New Century Fin., Inc. v. New Century Fin. Corp.*, 2005 WL 2453204, at *10 (S.D.Tex. Oct.4, 2005). The laches period begins to run "when the plaintiff knew or should have known of the infringement." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir.1998). The laches inquiry is fact-intensive, and is often inappropriately disposed of on summary judgment. *Dumdei v. Certified Fin. Planner Bd. of Standards, Inc.*, 1999 WL 787402, at *7 (N.D.Tex. Oct.1, 1999) (declining to rule on laches claim as a matter of law because of fact issues); *New Century Fin.*, 2005 WL 2453204, at *11 ("a finding of laches seems inappropriate on summary judgment where the parties con-

test several key facts"); *PSN Illinois, Inc. v. Ivoclar Vivadent, Inc.,* 398 F.Supp.2d 902, 906 (N.D.Ill.2005).

Interactive argues that Recursion and/or its predecessor, Objectspace, had knowledge or should have had knowledge of Interactive's use of the Voyager software based on, among other things: 1) statements made by Graham Glass, Objectspace's cofounder and chairman, to Ganyo and other software developers at a conference in Chicago in 1998 to the effect that software developers would be able to use Voyager for free so long as the software was not included in "devices"; 2) various communications from Objectspace indicating that Voyager was "free" for most commercial uses; 3) Ganyo's testimony that an unidentified woman, believed to be an Objectspace representative, told him that Interactive was on a "grandfathered" list of Voyager users who were not required to pay royalties for distributing Voyager in their software products despite what subsequent license agreements might provide.[7] (Def.App.6–7). On the other hand, Recursion has cited to evidence indicating that: 1) Objectspace was not aware specifically how, or in what specific types of applications, Interactive was using Voyager; 2) Objectspace has no records revealing Interactive's specific use of Voyager; and 3) Recursion itself did not learn of Interactive's use of Voyager until March 2003, six months before this suit was filed. In short, the Court finds that material fact issues exist as to when Recursion knew, or in the exercise of reasonable diligence should have known, that Interactive was making an unauthorized use of Voyager. *See New Century,* 2005 WL 2453204, at *11 (finding of laches is particularly appropriate where parties contest the facts relevant to when plaintiff "should have known" of the defendants' infringing use).

7. Recursion objects to Ganyo's testimony concerning the unidentified female on the ground that it constitutes inadmissible hearsay. (*See* Pl.'s Obj. to Def.'s Summ. J. Evid. at 6–7). Interactive responds that the testimony qualifies as an admission by party opponent and is thus not hearsay under Rule 801(d)(2)(D) of the Federal Rules of Evidence. (Def.'s Resp. to Pl.'s Obj. to Def.'s Summ. J. Evid. at 7). That rule provides that a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]" Fed. R. Evid. 801(d)(2)(D). The Fifth Circuit has stated that in situations where a purported agent is not identified by name, "a district court should be presented with sufficient evidence to conclude that the person who is alleged to have made the damaging statement is in fact a party or an agent of that party for purposes of making an admission within the context of Rule 801(d)(2)(D)." *Davis v. Mobil Oil Exploration and Producing Southeast, Inc.,* 864 F.2d 1171, 1174 (5th Cir.1989).

Interactive contends that the unidentified female's statements are corroborated by the documents attached to Ganyo's statement. (Def.App.10–38). These documents, together with Recursion's general acknowledgment that Objectspace had a "grandfather" policy, are generally consistent with the alleged agent's representations to Ganyo, and therefore constitute *some* evidence tending to show that the unidentified speaker was an agent of Objectspace. Nevertheless, such evidence, alone, provides an insufficient basis for this Court to conclude that an agency relation existed. *Cf. Davis,* 864 F.2d at 1174 (proponent of evidence and his co-workers had actually seen the unidentified agent of Mobil, who was wearing a Mobil hat, and co-workers provided unequivocal testimony that speaker was a Mobil company man). The Court notes that Recursion has offered evidence to refute Ganyo's testimony—that there were no female employees in Objectspace's Voyager sales production group. (Pl.App.108). Although the Court finds that Interactive has failed to meet its burden of showing an agency relationship for summary judgment purposes, it will reserve its final ruling on the admissibility of this evidence until the time of trial, where both parties will have the opportunity to present evidence to the Court on the admissibility of Ganyo's testimony.

### b. *Estoppel*

▆▆▆ For much the same reasons, summary judgment is improper on Interactive's affirmative defense of estoppel. To establish estoppel as a defense to a copyright infringement claim a defendant must show that: "(1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury." *Carson*, 344 F.3d at 453. Here, Interactive has not established as a matter of law that Recursion had knowledge of Interactive's allegedly infringing use of Voyager, thus precluding summary judgment.

### c. *Waiver*

▆▆▆ "Under Texas law waiver is a voluntary, intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *First Interstate Bank of Arizona, N.A. v. Interfund Corp.*, 924 F.2d 588, 595 (5th Cir. 1991). Whether a waiver occurred ordinarily involves a fact question focusing on intent. *See F.D.I.C. v. Niblo*, 821 F.Supp. 441, 451 (N.D.Tex.1993). Again, the Court finds that fact issues exist in the record regarding whether Recursion intentionally surrendered its rights with respect to Voyager or whether it otherwise engaged in intentional conduct that was inconsistent with those rights.

### 3. *Express and/or Implied License*

▆▆▆ Next, Interactive claims that all of Recursion's claims fail because Objectspace had granted it an express license to use Voyager. "A copyright owner may grant a license in his work, thereby waiving his right to sue the licensee for copy-

right infringement." *Pavlica v. Behr*, 397 F.Supp.2d 519, 526 (S.D.N.Y.2005). Interactive maintains that its license was conferred per the representations made by Graham Glass, Objectspace's founder and Chairman, at a conference in Chicago and per the alleged statement made to Ganyo by the unidentified female "representative" of Objectspace that Interactive was included on a "grandfathered" list of Voyager users who were not required to pay license fees for distributing Voyager in software. Interactive also claims that it was absolved from complying with certain licensing restrictions that were later placed upon the use of Voyager after Interactive was already using the software. In an attempt to understand this contention, a brief factual interlude is in order.

The licenses applicable to two of the earlier versions of Voyager—Version 1.0.1 and Version 2.0.0—permitted licensees to distribute Voyager, or certain components of it, with certain limitations. One of the primary restrictions was that "binaries" derived from or contained within the Voyager software could not be distributed if they were embedded in "hardware." (Pl. App.82, 84, 86). Notably, these license agreements did not restrict the use or distribution of binaries in "software". Objectspace changed its Voyager licensing requirements on March 23, 1998. (Pl.App. 106). From then on, licensees were no longer at liberty to embed, package or distribute Voyager components as part of "any software that is marketed or sold". (Pl.App.106). Interactive contends, however, that, according to Objectspace policy, the new licensing requirements did not apply to those who were using Voyager prior to March 23, 1998.

▆▆▆ Interactive relies on a March 24, 1998 e-mail message[8] from Timothy Milovich, General Manager of Objectspace's

---

**8.** The Court notes that this e-mail is not properly authenticated. "[E]-mails (like letters

Products Division, to an e-mail address listed as "voyager-interest@objectspace.com". (Def.App.37). The e-mail announced that Objectspace planned to charge royalties for those who download Voyager after March 23, 1998 and use it in an application marketed for sale. (Def.App. at 81). The e-mail further states that "[w]e also intend to honor our commitment that ALL future releases of Voyager Core Technology will be provided free of charge to those who downloaded our products prior to 3/23/98, in accordance with our previous license agreement." (Def.App. at 37). It continues: "What do we mean that ALL future releases of Voyager Core Technology will be available under the old license agreement to current users? It means exactly that!" (*Id.*). Interactive claims that it was a "current user" of Voyager and thus, pursuant to Objectspace policy, was not subject to the new licensing terms.

For its part, Recursion admits that Objectspace had instituted a "grandfather" policy which allowed licensees that had downloaded Voyager prior to March 23, 1998 to continue operating under the terms of their original license agreements "for all subsequent versions of ObjectSpace Voyager Core Technology (as defined by ObjectSpace)." (Pl.App.107, 116). However, Recursion maintains that the grandfather policy was project-specific, meaning that only those who downloaded Voyager for a specific project and used in it that project could use subsequent versions of Voyager under the original license terms for that particular project. (Pl.App. 107, 115).[9] Neither the March 24, 1998 Milovich e-mail (Def.App.37), nor the grandfather policy acknowledgment form (Pl.App.116), however, make reference to this "special project" requirement.

■ Considering the foregoing evidence in a light favorable to Recursion, the Court cannot say that Interactive had an express license as a matter of law. Far from it. Interactive certainly cannot rely on the alleged statements of Graham Glass at the Chicago conference to support its view that it was granted a perpetual express license to use Voyager in software it sold. (Def.App.6). Ganyo testified that Glass told him and other software developers that Objectspace "allowed *others* to include Voyager in other software in order to get software developers to use Voyager and become familiar with it" as part of Objectspace's grand strategic vision to ultimately spread the use of Voyager in devices, a use for which the company would, finally, charge royalties. (*Id.*). Glass's statements have more of an aspirational quality to them than anything else, and the Court finds that such statements cannot be relied upon as support for the view that Interactive was granted a perpetual express license to incorporate Voyager in the software applications it sold.

Nor can Interactive rely on the alleged statement by the unidentified female Ganyo says assured him that Interactive was not required to pay royalties for including

---

and other documents) must be properly authenticated or shown to be self-authenticating." *See Uncle Henry's Inc. v. Plaut Consulting Inc.*, 240 F.Supp.2d 63, 71–72 (D.Me. 2003). Although Ganyo declares in his statement that the e-mail was sent by "Objectspace", there is no evidence in the record that the e-mail was received by Ganyo or anyone at Interactive or that anyone at Interactive had reason to know of its existence. (Def.App.8).

9. Recursion also states that, to take advantage of the grandfather policy, a user was required to execute an acknowledgment form describing the policy. (Pl.App.107). Interactive maintains, however, that there is no evidence that Objectspace ever provided notice to users that the acknowledgment form had to be signed for the policy to apply.

Voyager in Interactive's software. (Def.App.7). As discussed in footnote four above, that statement is hearsay unless Interactive provides a sufficient evidentiary basis that the speaker was an agent of Objectspace. Interactive has not made that showing on the present record. And finally, Interactive has not properly authenticated the March 24, 1998 e-mail allegedly setting forth Objectspace's so-called grandfather policy nor has it established as a matter of law that Interactive qualified as a beneficiary under that policy. For all these reasons, summary judgment is improper.

 Interactive alternatively argues that it had an implied licence to use Voyager that, as a matter of law, bars all of Recursion's claims. "It is well-established in this circuit that a nonexclusive implied license need not be evidenced by a writing; rather, such a license may be implied from conduct or granted orally." *Carson*, 344 F.3d at 451 n. 5. Such licenses arise when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Lulirama, Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 879 (5th Cir.1997); *see also SmithKline Beecham Consumer Healthcare, L.P. v.* *Watson Pharm., Inc.*, 211 F.3d 21, 25 (2d Cir.2000) ("[C]ourts have found implied licenses only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'") (quoting *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir.1990)). Interactive points to no evidence showing that it requested Objectspace to create Voyager. Summary judgment should be denied on that basis alone. And even if the Court assumes arguendo that Objectspace, through its conduct, impliedly licensed Interactive to use certain versions of Voyager for some purposes, the question remains whether Objectspace's imposition of additional restrictions in the license agreement to Voyager 2.0.1 operated to revoke any such implied license.[10] Interactive has offered no evidence that its purported implied license was supported by consideration, which is required to establish an irrevocable implied license. *See e.g. Carson*, 344 F.3d at 451 ("It is settled that a 'nonexclusive license may be irrevocable if supported by consideration.'") (quoting *Lulirama*, 128 F.3d at 882); *Dumdei*, 1999 WL 787402, at * 5 ("Assuming *arguendo* that an implied license existed, an implied license is terminable at will."); *Pavlica*, 397 F.Supp.2d at 527 ("An implied license is freely revocable absent consideration.").

---

10. Recursion argues that Interactive's acceptance of the license terms to Voyager 2.0.1 constituted a novation, and that, alternatively, Interactive's express and/or implied license defenses are barred by the doctrines of waiver, and/or the parol evidence rule. Both a novation and waiver require a showing that, in accepting the license terms to Voyager 2.0.1, Interactive intended to relinquish its rights created under any pre-existing express license. *See Savitch v. Southwestern Bell Yellow Pages, Inc.*, 2005 WL 1839092, at *3–4 (Tex.App.—Fort Worth 2005, no pet.) ("A novation occurs if a contract evidences an intention to relinquish and extinguish pre-

exiting claims and rights of action[.]"); *F.D.I.C. v. Niblo*, 821 F.Supp. 441, 451 (N.D.Tex.1993) ("actual intent to relinquish" a right is an element of waiver). That showing has not been made on the present summary judgment record. Nor has Recursion proven a necessary predicate for the application of the parol evidence rule—that Voyager 2.0.1 constitutes an integrated agreement between the parties. *See Walley v. Bay Petroleum Corp.*, 312 F.2d 540, 544 (5th Cir.1963) (parol evidence rule does not come into play if writing constitutes only a partial integration of the parties' agreement).

*4. Whether Objectspace Properly Assigned to Recursion the Rights Recursion Seeks to Enforce in this Lawsuit*

■■■ Interactive next argues that Recursion has no standing to assert copyright claims based on acts occurring before December 20, 2001, the date Recursion acquired from Objectspace the intellectual property rights to Voyager. Interactive further contends that Recursion cannot bring contract claims for contracts entered into by its predecessor, Objectspace, because Objectspace did not assign to Recursion its rights under any license agreements. Recursion attaches to its summary judgment materials the Asset Purchase Agreement ("APA"), dated December 20, 2001, and various corresponding assignment agreements between it and Objectspace, whereby Recursion purchased certain of Objectspace's assets.

Section 2.1 of the APA provides as follows:

(a) *Purchase and Sale of Acquired Assets.* Upon the terms and subject to the conditions of this Agreement, Seller agrees to sell, assign, transfer, convey and deliver to Purchaser ... and Purchaser agrees to purchase and acquire from the Seller, at the Closing on the Closing Date, all of the right, title and interest of Seller in, to and under the following assets (collectively the "*Acquired Assets*"):

 (i) the Intangible Personal Property;

 ...

The APA defined various terms used in the agreement, including:

"*Intangible Personal Property*" means the rights of [Objectspace] arising under or in connection with the Intellectual Property, including (i) all licenses, sublicenses and other agreements to which [Objectspace] is a party and pursuant to which [Objectspace] or any other person is authorized to use any of the Intellectual Property[.]

"*Intellectual Property*" means "the Software [itself defined to include the Voyager product line] and, with respect to the Software, ... (d) copyrights ... (j) all rights to products, proceeds, royalties and income with respect to any of the foregoing, and (k) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing."

(Pl.App.9–10, 12). According to Interactive, that the APA was only an "agreement to agree" to transfer some of Objectspace's assets at a later closing and that Objectspace's assets were actually transferred under separate assignment agreements to be delivered at the closing. Interactive first argues that Objectspace's rights under the license agreements were not transferred to Recursion because the agreement transferring Objectspace's intellectual property rights, entitled "Assignment Agreement— Intellectual Property" (the "Intellectual Property Agreement"), does not mention licenses. However, even accepting as true Interactive's premise that the APA itself does not actually transfer assets, that the *Intellectual Property Agreement* does not transfer *licenses* is not surprising—that agreement is focused on the transfer of "Intellectual Property" as that term is defined by the APA. (Pl.App.39–40). Licenses are not included within that definition; however, licenses are specifically included in the definition of "Intangible Personal Property", the rights to which appear to have been transferred pursuant to a separate agreement—the "Assignment and Assumption Agreement". (Pl.App.9, 37–38).[11]

---

**11.** The Court notes that the copy of the Assignment and Assumption Agreement submitted by Recursion is unsigned. (Pl.App.38). Interactive has not challenged the effective-

The Assignment and Assumption Agreement provides in pertinent part that:

1. Each term which is defined in the [Asset] Purchase Agreement and which is used but not defined herein shall have the meaning ascribed to such term in the Purchase Agreement.

2. Seller hereby conveys, grants, transfers and delivers to Purchaser, and Purchaser hereby accepts and receives all of Seller's rights, title and interest in, to and under: ... (ii) *the Intangible Personal Property* [.]

(Pl.App.37). Because licenses were encompassed within the definition of "Intangible Personal Property" in the APA, Recursion acquired Objectspace's license rights by virtue of the Assignment and Assumption Agreement, which transfers the Intangible Personal Property.

 Interactive next argues that Recursion cannot sue for any copyright infringement that occurred before December 21, 2001—the date Recursion acquired Objectspace's copyrights—because the Intellectual Property Agreement did not expressly include the right to sue for past copyright infringement. The mere assignment of a copyright does not automatically confer upon the assignee the right to sue for accrued claims. *Prather v. Neva Paperbacks, Inc.*, 410 F.2d 698, 700 (5th Cir. 1969); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991); *Seastrunk v. Darwell Integrated Tech., Inc.*, 2005 WL 1667811, at *3–4 (N.D.Tex. July 15, 2005). "Unless the assignment of copyright contains language explicitly transferring causes of action for prior infringements, the assignee cannot maintain a suit for infringements which happened before the effective date of the assignment.' " *Prather*, 410 F.2d at 700 (internal quotations and citation omitted).

As set forth above, the definition of "Intellectual Property" in the APA encompassed copyrights, including all rights to sue for present and past infringement of such copyrights. Notably, however, "Intellectual Property" was not listed among the "Acquired Assets" that the parties agreed to transfer under Section 2.1 of the APA. (Pl.App.12). And, as Interactive points out, in the Intellectual Property Agreement, the clauses transferring patents and trademarks expressly included rights for past infringement, while the corresponding clause pertaining to the transfer of copyrights did not. (Pl.App.39). Interactive maintains that this omission means that Recursion cannot sue for copyright infringement claims that accrued prior or to the date of the assignment.

 In response, Recursion has presented evidence that it entered into a separate Assignment Agreement with Objectspace on February 14, 2000, whereby the parties made clear that Objectspace assigned to Recursion all of its copyright interests, "including the right to sue for past infringement", in certain "works". (Pl.App.79). Among the "works" was Voyager Software (Reg. No. TXu 787–970). (Pl.App.79, 81). Interactive does not challenge or even mention this Assignment Agreement. A party may "amend an assignment to clarify that it was intended to convey accrued causes of action". *Seastrunk*, 2005 WL 1667811, at *5 n. 2. Although the February 14, 2000 Assignment Agreement appears to properly assign to Recursion Objectspace's rights to sue for past copyright infringement of the Voyager software, the Court cannot affirmatively say that it has, as the copy of the agreement that has been submitted to the Court is in large part illegible. However, the

ness of that agreement, however. Indeed, neither party has mentioned it. The Court assumes for summary judgment purposes that

it was properly executed and constituted an effective agreement.

Court finds that Recursion has at least raised a fact question on the issue of whether it can sue for past copyright infringement in this case.

### 5. Whether Recursion's Copyright Claim is Barred by the Doctrine of Fair Use

■ Next, Interactive maintains that Recursion's copyright claim is barred by the fair use doctrine. In determining whether the doctrine applies, the Court considers the following statutory factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use on the potential market for or value of the copyrighted work. 17 U.S.C. § 107. Interactive focuses its attention on the third factor, contending that Voyager forms only a "minuscule" part of the Interaction Recorder software—only 26 of Interaction Recorder's 69,602 lines of software code reference Voyager, and of Voyager's 1,697 software functions, Interaction Recorder references only 11. (Def.App.41–42). However, Interactive's own corporate representative, Ganyo, testified that the operability of Interaction Recorder (or the server with which it interacts) would be "seriously degraded" without Voyager. (Pl.App.147). And Recursion has provided evidence that the sheer number of lines of Voyager code referenced in Interaction Recorder has little if any bearing on the role Voyager plays in the software. (Pl.App.500). Summary judgment would therefore be improper on this factor alone. Moreover, the application of the remaining fair use factors militates against summary judgment; for example, it is undisputed that Interactive is using Voyager for commercial, not public, purposes. (Def.App.157).

### 6. Whether Recursion's Copyright Claim is Barred by Limitations

■ Interactive next claims that Recursion's copyright infringement claim is barred by limitations. A copyright infringement action must be brought within three years after the claim accrued. 17 U.S.C. § 507(b). Interactive recognizes the existence of two conflicting Fifth Circuit panel decisions regarding when a copyright infringement action must be brought after a claim accrues. In *Makedwde Publishing Co. v. Johnson*, 37 F.3d 180 (5th Cir.1994), the Fifth Circuit held that the statute of limitations does not bar claims that accrued within the three-year period prior to the commencement of the lawsuit, but that claims accruing more than three years before the action is filed are time-barred. *Id.* at 182. Just months later, a different Fifth Circuit panel held that the statute of limitations bars *any* claims brought three·years after the cause of action accrued. *Daboub*, 42 F.3d at 290–91.

The district court in *King Empire, Inc. v. Milan Courtyard Homes, Ltd.*, 173 F.Supp.2d 649 (S.D.Tex.2001) addressed the conflict between the *Makedwde* and *Daboub* decisions as follows:

> It is well established that one Fifth Circuit panel cannot overrule the decision of another panel; panel decisions may be overruled only by the Fifth Circuit sitting *en banc* or by a subsequent decision of the Supreme Court. *E.g., Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir.1997); *Grabowski v. Jackson County Public Defenders Office*, 47 F.3d 1386, 1400 n. 4 (5th Cir. 1995) (J.Smith, concurring in part and dissenting in part); *FDIC v. Dawson*, 4 F.3d 1303, 1307 (5th Cir.1993); *Burlington N.R.R. v. Brotherhood of Maintenance of Way Employees*, 961 F.2d 86,

89 (5th Cir.1992); *Pruitt v. Levi Strauss & Co.*, 932 F.2d 458, 465 (5th Cir.1991). The rule that one panel cannot overrule another panel is usually cited in the context of a discussion in which a party asks the court to "reexamine" an earlier Fifth Circuit decision or when a later panel is in disagreement with an earlier decision. However, it does not appear that the differing results in *Makedwde* and *Daboub* as to appropriate application of the limitations period are due to disagreement between the panels or even contrary interpretation of the applicable precedent. *Daboub* was decided less than three months after *Makedwde*. Although the court in *Daboub* discussed and rejected the continuing tort theory, it did so without analysis of *Makedwde*, the seminal cases in this area, or the split among the circuits. Judge Smith of the Fifth Circuit has said:

[O]ur rule of orderliness comes into play when two panels become "ships passing in the night." A subsequent panel may be unaware of an earlier holding and, consequently, may reach a contrary result. No *interpretation* is involved, as the later panel makes no mention of the earlier case. In such an instance, we can easily say that the later opinion is a nullity; any other rule would invite judicial chaos. *Grabowski v. Jackson County Public Defenders Office*, 47 F.3d 1386, 1400 n. 4 (5th Cir.1995) (J.Smith, concurring in part and dissenting in part).

In light of the foregoing, *Makedwde* is the controlling precedent before the Court. Defendants are liable for acts of infringement, if any, committed within the three-year period prior to the filing of this lawsuit.

*Id.* at 653–54 (footnotes omitted). This Court follows the reasoning of *King Empire* Court and thus follows the Fifth Cir-

cuit's decision in *Makedwde*. Therefore, even if Recursion's copyright infringement claim accrued more than three years prior to the date this action commenced,[12] Recursion could still recover for acts of infringement occurring within three years of that date.

■■■■■ "A cause of action for copyright infringement accrues when one has knowledge of a violation or is chargeable with such knowledge." *Hotaling v. Church of Jesus Christ of Latter–Day Saints*, 118 F.3d 199, 202 (4th Cir.1997); *Barbour v. Head*, 178 F.Supp.2d 758, 765 (S.D.Tex.2001). As discussed above, the Court finds that fact issues exist as to when Recursion and/or its predecessor-in-interest, Objectspace, had knowledge of Interactive's allegedly infringing use of Voyager or was chargeable with such knowledge. The Court further notes that summary judgment is improper because Interactive has failed to point to any evidence establishing the date on which Recursion's copyright claim accrued. Interactive's argument on the limitations issue does not even mention an accrual date, and it is unclear from the record exactly when Interactive's alleged infringement began.

7. *Interactive's Additional Defenses to Recursion's Breach of Contract Claim*

a. *Whether Recursion Has Standing to Enforce Contracts Entered Into by Objectspace*

■■■■ Interactive's next grounds for summary judgment concern Recursion's claim that Interactive breached the Voyager license agreements by failing to prevent others within its control from violating those agreements. First, Interactive contends that the claim fails because Interac-

---

12. The Court notes that the parties have not addressed the issue of whether Recursion's copyright claims against Interactive "relate back" to the initial filing of this suit.

tive did not have an agreement with Recursion, only Objectspace. However, as explained above, Objectspace assigned its rights under the licenses forming the basis of Recursion's breach of contract claims to Recursion under the APA and the Assignment and Assumption Agreement. Having been assigned all rights under the Voyager license agreements, Recursion stands in the shoes of Objectspace and may seek to recover for breaches of those agreements. *See Cadle Co. v. 1007 Joint Venture*, 82 F.3d 102, 105 (5th Cir.1996) ("An assignee stands in the shoes of his assignor.").

### b. *Whether Recursion's Breach of Contract Claim Fails for Lack of Consideration*

Interactive also argues that Recursion's contract claim fails for lack of consideration. Interactive claims that it received no consideration in exchange for its promise to prevent those within its "control" or "service" from packaging products using Voyager in "hardware" because it already had an express license to use Voyager in its software. The Court must confess to a lack of understanding of this argument. The "policing" requirement imposed by the Voyager license agreements applied at least as far back as the license agreement to Voyager 1.0.1. (Pl.App.82). Even the March 24, 1998 e-mail, one of the sources of Interactive's purported "express license", notes that "grandfathered" licensees still had to comply with the terms of previous license agreements. (Def.App.37). Although it is unclear when Interactive first became bound by a Voyager license agreement, it would appear that Interactive's obligation to take steps to prevent others from packaging Voyager in hardware preexisted the express license it claims to have received. And in any event, the Court has already found that Interactive has failed to establish that it received an express license as a matter of law; therefore it cannot find as a matter of law at this juncture that no consideration supported the license agreement underlying Recursion's breach of contract claim.

### c. *Whether Recursion's Breach of Contract Claim Fails on the Merits*

■ Even assuming the existence of a valid contract, Interactive next argues that it did not breach the contract because neither Interactive nor its resellers embedded Voyager in "hardware." Recall that the license agreements impose an obligation upon the licensee to "take all necessary steps" to ensure that the terms of that agreement were not violated by those within the licensee's "control" or "service". One of those terms prevented the "packaging" or "embedding" of Voyager's binaries in "hardware." According to Interactive, there was no breach because neither it nor its resellers packaged or embedded Interaction Recorder (and hence Voyager) in "hardware". Recursion contends that one of Interactive's resellers, Alliance Systems, Inc., "admits to selling Defendant's software copied and configured onto hardware sold simultaneously, including Interaction Recorder." (Pl.'s Resp. Brief to Def.'s Mot. Summ. J. at 45). Recursion cites to the testimony of John Shapiro, Alliance's CEO, in which Shapiro states that Alliance was a "value-added distributor" of Interaction Recorder. (Pl.App. at 371). However, having reviewed the cited testimony, the Court finds that it fails to make clear whether Alliance ever copied or sold Interaction Recorder onto "hardware." Indeed, Shapiro declares in his statement that "Alliance has never installed Interaction Recorder software on any computer system or hardware sold or shipped by Alliance." (Def.App.62). In its reply brief to its motion for summary judgment Interactive also cites to the testimony of Bill Millan, Alliance's Project Manager, who installed certain software on computers sold by Alli-

ance to a company called VE Systems. Millan states that Interaction Recorder was not installed on the computers. (Def.App.70, 75, 77). Given the lack of clarity and conflicting evidence in the record, the Court finds that the issue of whether Interactive's resellers packaged or embedded Interaction Recorder onto "hardware" is best left for the jury to determine.

The Court is also unimpressed with Interactive's view that it is entitled to summary judgment on the ground that "hardware", as that term is used in the License Agreement, applies only to devices "such as hot tubs, cell phone pagers, and the like, not general purposes [sic] computers." (Def.'s Mot. Summ. J. Brief at 25). Interactive has itself argued that the term "hardware" is ambiguous. (Def.'s Resp. Brief to Pl.'s Mot. Summary J. at 18). And in any event, the evidence on what the parties meant by the use of that term is conflicting. Graham Glass, Objectspace's founder and former Chairman, for example, testified that the "hardware" referred to in the License Agreement is "really meant to be any hardware" and that "a regular PC would be hardware." (Pl.App. at 471). Ganyo, too, testified that the definition of "hardware" includes computers. (Pl.App. at 147). As discussed more fully, *infra*, triable issues of fact exist as to whether Interactive's applications using Voyager were inappropriately embedded in "hardware."

Next, Interactive makes the argument that its resellers are not parties to the applicable Voyager license agreements and cannot be bound by the terms of those agreements. Maybe so, but Recursion has not asserted claims in this lawsuit against Interactive's resellers; rather, Recursion claims that Interactive breached an agreement to take all necessary steps to ensure that those under Interactive's "control" or in its "service" not violate the terms of the license agreement. Recursion's contract claim lies against Interactive, who *is* purported to be a party to the license agreement.

Interactive denies that it breached the license agreement because it did not exercise "control" over its resellers. Interactive relies on testimony of Tyler Baldwin, who states in conclusory fashion that Interactive has no control over its resellers. (Def.App. at 142–43). Recursion has put forth evidence that Interactive's resellers are subject to certain contractual obligations imposed by Interactive which can be construed as a form of "control", and it points out that the license agreement also imposes a duty upon Interactive to police those persons "in the Licensee's service." (*See e.g.* Pl.App. 378, 245–46, 298–312). Interactive neither argues nor offers any evidence showing that its resellers were not in its "service".

d. *Whether Recursion's Breach of Contract Claim is Barred by Limitations*

 Interactive next argues that Recursion's contract claim is barred by limitations. Under Texas law a breach of contract claim must be brought within four years after it accrues. *Stine v. Stewart,* 80 S.W.3d 586, 592 (Tex.2002); Tex. Civ. Prac. & Rem. Code § 16.051. A breach of contract claim accrues when the breach occurs or when the claimant has notice of facts sufficient to place him on notice of the breach. *Cont'l Cas. Co. v. Dr. Pepper Bottling Co. of Texas, Inc.,* 2005 WL 440395, at * 3 (N.D.Tex. Feb.23, 2005). While Interactive states that the "contract" was breached in February 1999, it fails to cite to any evidence on that score, nor does it explain which contract was breached at that time or how it was breached. Additionally, as discussed above, triable fact issues exist as to when Recursion was put on notice of facts that should have alerted it to a breach of its license agreements.

*8. Whether Recursion's Claim for Attorney's Fees Fails for Failing to Properly Present its Claim Under Texas Law*

■ Finally, Interactive maintains that Recursion is not entitled to recover attorney's fees should its breach of contract claim prove successful because Recursion has not properly presented the claim. A party may recover attorney's fees under § 38.001 of the Texas Civil Practice and Remedies Code only if it presents the claim to the opposing side and if the opposing side does not pay the claim within 30 days of presentment. TEX. CIV. PRAC. & REM. CODE § 38.002; *Bowles Constr. Co. v. Bridwell*, 2002 WL 32344569, at *4 (Tex. App.—Eastland 2002, no pet.) (not designated for publication). There is no mandatory form or manner in which a claim must be presented. *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex.1981). The presentment requirement is to be liberally construed to promote its underlying purpose, which is to allow the party against whom the claim is asserted an opportunity to pay the claim within 30 days of receiving notice of it before incurring an obligation for attorney's fees. *Id.*

Interactive complains that Recursion's June 20, 2003 demand letter did not include a demand for payment; rather, it merely demanded that Interactive immediately obtain a return of all of its products containing the Voyager software. Recursion points out that the letter proceeded to provide in the alternative that "Recursion would be willing to license the Software for commercial deployment for a license fee of $1,500 per licensed CPU." (Pl.Supp.App. 514–17).

■ The Court need not resolve the issue of whether Recursion's demand constituted a proper presentment of its claim at this time because Interactive's motion for summary judgment on this issue is premature. Under Texas law, a party may present a contract claim up to 30 days before trial. *See Gordon v. SouthTrust Bank*, 108 Fed.Appx. 837, 843 (5th Cir. 2004); *McAdams v. McAdams*, 2002 WL 342639, at *7–8 (Tex.App.-Amarillo 2002, no pet.) (not designated for publication). Because trial has not yet been set in this matter, the Court finds that Recursion cannot establish its entitlement to summary judgment on the presentment issue at this time.

**B. Plaintiff's Motion for Summary Judgment**

Recursion, for its part, moves for summary judgment in its favor on its breach of contract claim and on Interactive's fraudulent inducement and breach of implied warranty claims. The Court will examine whether Recursion is entitled to summary judgment on each of those claims in turn.

*1. Whether Recursion is Entitled to Summary Judgment on its Breach of Contract Claims*

■ Recursion's breach of contract claims can essentially be distilled into two categories.[13] Recursion first argues that Interactive violated the license agreement to Voyager 2.0.1 by embedding Voyager in

---

**13.** There is no dispute that Interactive incorporated elements of Voyager in its Interaction Recorder program that is sold and licensed to end users. (Pl.App.126). There is conflicting evidence in the record, however, regarding which versions of Voyager were used, and when. (Pl.App.148). Knowing such information is important because different license agreements applied to different versions of

Voyager. Interactive's interrogatory responses indicate that versions of Interaction Recorder from February 1998 to October 1999 used Voyager 1.0.1, while sales of Interaction Recorder after October 1999 used Voyager 2.0.1. (Pl.App. at 126). Sheley testified, however, that to his knowledge Voyager 2.0.1 is the only version of Voyager that has been used in Interaction Recorder. (Pl.App.200).

Interactive's Interaction Recorder software, a program which is marketed and sold. Second, Recursion maintains that, regardless of which version of Voyager was used, Interactive breached the corresponding license agreement by permitting its resellers to package Interaction Recorder (containing Voyager) in "hardware." To establish a breach of contract claim under Texas law, a plaintiff must prove: (1) the existence of a valid contact; (2) the plaintiff's performance or tendered performance; (3) the defendant's breach of the agreement; and (4) the plaintiff's resulting damages. *See Dorsett v. Cross,* 106 S.W.3d 213, 217 (Tex.App.—Houston [1st Dist.] 2003, pet. denied). For a contract to exist, the parties manifest their assent to be bound by it. *Alliance Milling Co. v. Eaton,* 86 Tex. 401, 25 S.W. 614, 616 (1894).

■ The Court will begin by examining Recursion's first breach of contract claim. Fundamental to that claim is the question of whether the parties assented to be bound by the license agreement to Voyager 2.0.1. It is undisputed that Interactive used Voyager 2.0.1 and incorporated elements of it into Interaction Recorder. (Pl.App.199–200). Interactive also admits that the license agreement applicable to Voyager 2.0.1 is saved in Interactive's computer system. (Pl.App.202). Ganyo testified that it appears from various records that he personally downloaded Voyager 2.0.1 and saved it on Interactive's system, although he has no specific recollection of doing so. (Pl.App.151). To download the Voyager software, one had to go to Objectspace's website and follow certain protocol. (Pl.App.90, 100). The user would have to first provide certain information to get to the download/license page. (Pl.App.90). That page provided the terms of the license agreement in a window. Because the entire agreement could not be viewed at once, the page allowed the user to scroll down the window to see the rest of the agreement. At the bottom of the page was a question asking whether the user accepts all of the terms of the license agreement. The user could only download the software by answering in the affirmative. A "no" answer would lead the user to a screen informing the user that the terms of the license agreement must be accepted to download the software.

These types of licenses are known as "clickwrap" license agreements and are commonly used when software is distributed or sold via a website. *See Am. Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc.,* 106 F.Supp.2d 895, 905 n. 15 (N.D.Tex.2000) ("A 'clickwrap agreement' allows a consumer to assent to the terms of a contract by selecting an 'accept' button on the web site."); *Mortgage Plus, Inc. v. DocMagic, Inc.,* 2004 WL 2331918, at *4 (D.Kan. Aug.23, 2004); *Hotels.com, L.P. v. Canales,* 2006 WL 228720, at *6 (Tex. App.—San Antonio Feb. 1, 2006, no pet h.) (not designated for publication). Clickwrap licenses are similar in nature to and derive their name from "'shrinkwrap" licenses, which become effective once the cellophane shrinkwrap commonly found on computer software boxes is opened. *See Specht v. Netscape Communications Corp.,* 306 F.3d 17, 22 n. 4 (2nd Cir.2002); *Mortgage Plus, Inc.,* 2004 WL 2331918, at *4. Although the Court could find and has been referred to no Fifth Circuit authority directly speaking to the issue, other courts have found both types of licenses to be enforceable.[14] *See e.g. ProCD, Inc.,* 86

---

**14.** Interactive characterizes the license agreement to Voyager 2.0.1 as a "browsewrap" license agreement and argues that such licenses are unenforceable under Texas law.

(Def. Reply to Def.'s Mot. Summ. J. at 16 & n. 3). Browsewrap licenses, however, are distinguishable from clickwrap licenses. A

F.3d at 1450 (shrinkwrap); *Mortgage Plus, Inc.*, 2004 WL 2331918, at * 5 (clickwrap); *i–Systems, Inc. v. Softwares, Inc.*, 2004 WL 742082, at *7 (D.Minn. March 29, 2004) (clickwrap); *I.Lan Sys., Inc. v. Netscout Serv. Level Corp.*, 183 F.Supp.2d 328, 338 (D.Mass.2002) (clickwrap).

And at least one Texas appellate court has upheld the enforceability of a quick-wrap agreement. *See Barnett v. Network Solutions*, 38 S.W.3d 200, 204 (Tex.App.—Eastland 2001, pet. denied). In *Barnett*, an individual, Randall Barnett, desired to register certain internet domain names through Network Solutions, Inc. ("NSI"). *Id.* at 202. The registration agreement was in electronic format and required Barnett to scroll through the contract before accepting it and obtaining the registration. *Id.* The contract contained a Virginia fo-

---

"browsewrap" license is typically part of a web site—its terms may be posted on the site's home page or may otherwise be accessible via a hyperlink. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427–30 (2nd Cir.2004); *Hotels.com, L.P.*, 2006 WL 228720, at *6. In contrast to clickwrap licenses, a user may download software under a browsewrap license prior to manifesting assent to its terms. *Id.*

The Second Circuit distinguished between the two types of licenses in *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2nd Cir. 2002).' Certain sets of plaintiffs in *Specht* downloaded two different programs from Netscape—Communicator and SmartDownload. *Id.* at 21. When the plaintiffs began to download Communicator, a scrollable text of the program's license agreement appeared, and the plaintiffs were not allowed to complete installation of the program until they had clicked on a "Yes" button manifesting their acceptance of all license terms. *Id.* at 22. Installation would be aborted if a user attempted to install the program without clicking "Yes". *Id.* The court characterized this type of online license agreement as a "clickwrap" license. *Id.* at 22 n. 4. The plaintiffs did not even dispute that they assented to Communicator's license terms by clicking "Yes". *Id.* at 35.

The process of downloading SmartDownload was different. With respect to that program, the plaintiffs encountered a download screen, at or near the bottom of which was a prompt entitled "Start Download" and a tinted "Download" button. *Id.* at 22. By clicking "Download", the download process started. (*Id.*). According to the court:

> The signal difference between downloading Communicator and downloading Smart-Download was that no clickwrap presentation accompanied the latter operation. Instead, once plaintiffs [] had clicked on the "Download" button located at or near the

bottom of their screen, and the downloading of SmartDownload was complete, these plaintiffs encountered no further information about [SmartDownload] or the existence of license terms governing its use. The sole reference to SmartDownload's license terms on the "SmartDownload Communicator" webpage was located in text that would have become visible to plaintiffs only if they had scrolled down to the next screen.

. . . . .

> ... Having selected SmartDownload, [plaintiffs] were required neither to express unambiguous assent to that program's license agreement nor even to view the license terms or become aware of their existence before proceeding with the invited download of the [] program. Moreover, once these plaintiffs had initiated the download, the existence of SmartDownload's license terms was not mentioned while the software was running or at any later point in plaintiffs' experience of the product.

*Id.* at 23. The court concluded that, with respect to SmartDownload, the plaintiffs did not manifest their assent to that program's license terms: "where consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms." *Id.* at 32.

This Court finds that the download process for Voyager is akin to that of the Communicator program in *Specht*—in both cases the user's very ability to download the program was predicated upon its acceptance of the license terms. A user who disagreed with the terms of the license and did not wish to manifest acceptance of them had at all times the option to simply not download the program.

rum selection clause. *Id.* Barnett accepted the contract and later filed suit against NSI for failing to register certain domain names for which he believed he had contracted. *Id.* The district court dismissed the suit on the ground that any suit on the contract had to be brought in Virginia under the forum selection clause. *Id.* The appellate court affirmed, rejecting Barnett's argument that he did not have adequate notice of the forum selection clause because it was "hidden" in the agreement:

> By the very nature of the electronic format of the contract, Barnett had to scroll through that portion of the contract containing the forum selection clause before he accepted its terms.... It was Barnett's responsibility to read the electronically-presented contract, and he cannot complain if he did not do so.

*Id.* at 203–04.

▮ Relying on the above-cited case authority, the Court finds that clickwrap licenses, such as at issue here, are valid and enforceable contracts. This still leaves the issue of whether Interactive agreed to the terms of the license agreement to Voyager 2.0.1 by clicking "Yes" on the clickwrap license. Interactive maintains that there is no evidence that it ever agreed to the terms of that agreement. (Def. Reply Brief to Pl.'s Mot. Summ. J. at 15). The Court disagrees in part. It is undisputed that Interactive used Voyager 2.0.1 and embedded it in Interaction Recorder. There is unchallenged testimony in the record that, to install Voyager 2.0.1, a user must accept the license terms under the website protocol discussed above. (Pl. App. at 90). And even if the software

were not obtained from the website, the user would still have to accept the license terms before the software could be installed. Without accepting the terms of the license, installation is impossible. (*Id.* at 90–91). Therefore, the Court finds that the record evidence is sufficient to support the conclusion that Interactive could not have incorporated Voyager 2.0.1 in the software without clicking "Yes" to the terms of the license agreement.

Recursion has also put forth evidence supporting the remaining elements of a breach of contract claim. For example, Recursion has established that it performed under the license agreement by allowing Interactive to use the Voyager software. The third element—breach—is also met. The record shows that Interactive embedded Voyager 2.0.1 in software (Interaction Recorder) that was marketed and sold. Finally, Recursion has submitted evidence that it suffered damages from Interactive's breach, although the measure of damages is not susceptible to precise calculation on the present state of the record. (Pl.App.3).

Even though Recursion has submitted evidence on each element of its first breach of contract claim, the Court finds that it is not entitled to summary judgment on that claim. First, as discussed above, fact issues exist on Interactive's affirmative defenses of laches [15], estoppel, and waiver. Interactive also contends that Objectspace granted it an express license to use Voyager in its software without having to pay license fees for that use. Specifically, Interactive points to the March 24, 1998 e-mail in which Objectspace stated that "ALL future releases of

---

**15.** Some courts have found that laches may not be raised as a defense to breach of contract claims. *See U.S. Restaurant Props. Operating L.P. v. Burger King Corp.*, 2003 WL 21448389, at *6 (N.D.Tex. June 16, 2003) (finding that invocation of laches defense was

"unnecessary and redundant" in an action at law for breach of contract that was governed by a statute of limitations). Because the parties did not raise the issue, the Court does not address it.

Voyager Core Technology will be available under the old license agreement to current users[.]" (Def.App.37). On the present state of the record, Interactive has not established whether it received this communication nor whether it qualified as a "current user" under the grandfather policy. Nor have the parties adequately addressed the legal effect of Interactive's "express license", assuming its existence, in the face of Interactive's "acceptance" of the license agreement to Voyager 2.0.1. Confronted with all of these uncertainties, the Court cannot grant summary judgment on Recursion's first breach of contract claim.

Nor is Recursion entitled to summary judgment on its second claim that Interactive breached Objectspace license agreements by including, or permitting its resellers to include, Voyager versions 1.0.1 and/or 2.0.1 in a product that is "packaged with, or embedded in, hardware". First, Recursion has offered insufficient evidence that Interactive breached the agreements. Recursion has shown that Interactive allows its resellers to sell its software packaged with or installed on hardware. The point, however, is not whether, as a general matter, Interactive permits its resellers to package some of the it sells in hardware, but whether it packages (or allows its resellers to package) software incorporating elements of *Voyager* (i.e. Interaction Recorder) in hardware. On that score Recursion offers slender evidence. As discussed above, Recursion relies on the testimony of Jonathan Shapiro, the CEO of one of Interactive's resellers, claiming that Shapiro "admitted" to selling Interactive's software, including Interaction Recorder, on hardware. (Pl.app.371–72). But the cited passage of Shapiro's testimony does not even mention "Interaction Recorder", much less "Voyager." Recursion also cites to what appear to be a number of bills and invoices but fails to explain the significance of this evidence. (Pl.App.386–459). In

short, the evidence relied on by Recursion is hardly sufficient to warrant summary judgment on its second breach of contract claim.

 Interactive also posits that the meaning of the term "hardware" is ambiguous. The Court agrees. The determination of whether a contract is ambiguous is a question of law for the court to decide. *See Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex.1993); *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex. 1983); *Philadelphia Am. Life Ins. Co. v. Turner*, 131 S.W.3d 576, 587 (Tex.App.— Fort Worth 2004, no pet.). "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. A contract, however, is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Coker*, 650 S.W.2d at 393 (internal citations omitted). Summary judgment is generally appropriate only if the language of the contract is wholly unambiguous. *Singer v. Carrington Labs., Inc.*, 2003 WL 22300140, at *4 (N.D.Tex. Oct.3, 2003); *Coker*, 650 S.W.2d at 394 ("When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue."). The Court may consider the parties' differing interpretations of a given term only after it has found the term to be ambiguous. *National Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995).

The Court finds that the meaning of the term "hardware" as used in the Objectspace license agreements is uncertain and doubtful and reasonably susceptible to multiple meanings. Recursion believes that the term encompasses devices such as general purpose computers while Interac-

tive, relying on various communications from Objectspace, contends that the term is restricted to certain items like cell phones, pagers, etc. Having found that the term "hardware" is ambiguous, the Court finds that the parties may offer parol evidence at trial to ascertain the parties' true intent. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex.1996).

 Recursion contends that Interactive has waived its ambiguity defense because it was not pleaded. However, the interpretation of a contract, including the determination of whether its terms are ambiguous, "is a matter of law, and the court 'may conclude that a contract is ambiguous even in the absence of such a pleading by either party.'" In re *Newell Indus., Inc.*, 336 F.3d 446, 449 n. 5 (5th Cir.2003) (quoting *Sage St. Assoc.*, 863 S.W.2d at 445); *see also Calhoun v. Killian*, 888 S.W.2d 51, 54 (Tex.App.—Tyler 1994, writ denied) ("If a written document is ambiguous, it cannot support a summary judgment, since its meaning raises a fact issue, even if the parties fail to allege such ambiguity."); *cf. Media Brokers Inc. v. A.H. Belo Corp.*, 2000 WL 1839740, at **4–5 (Tex.App.—Dallas 2000, pet. denied) (concluding that trial court abused its discretion in submitting ambiguity question to the jury where the issue was neither supported by the pleadings nor tried by consent and no trial amendment was sought to be filed).

2. *Whether Recursion is Entitled to Summary Judgment on Interactive's Fraudulent Inducement Counterclaim*

 To prevail on its fraudulent inducement counterclaim, Interactive must establish that: "(1) a material misrepresentation was made; (2) when the misrepresentation was made, the speaker knew it was false or made it recklessly without any

knowledge of the truth and as a positive assertion; (3) the speaker made the misrepresentation with the intent that the other party should act on it; and (4) [the claimant] detrimentally relied on the misrepresentation" *See Lewis v. Bank of Am., N.A.*, 343 F.3d 540, 545 (5th Cir.2003) (citing In re *FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex.2001)). Recursion points to the absence of evidence supporting Interactive's fraudulent inducement claim. The Court agrees that Interactive has failed to come forth with competent summary judgment evidence showing that Objectspace knew that any representations it made were false or were made with reckless disregard of their truth. Instead Interactive simply relies on the flawed logic that recklessness is demonstrated simply because the alleged representations about the scope of Interactive's license to use Voyager allegedly made in the late 1990s conflict with the position asserted by Recursion in this lawsuit that Interactive's use of Voyager violated applicable license agreements. Interactive has failed to come forward with competent summary judgment evidence showing that any statements made by Objectspace representatives upon which Interactive's fraudulent inducement theory is based were known to be false, or were recklessly made without knowledge of their veracity, at the time they were made. *See e.g. Valley Reg'l Med. Ctr. v. Wright*, 276 F.Supp.2d 638, 643 (S.D.Tex.2001) (rejecting fraudulent inducement claim where no summary judgment evidence indicated that statements were known to be false or were asserted without knowledge of their truth at the time they were made); *Bauer v. Thomas*, 2003 WL 69557, at * 6 (Tex.App.—Fort Worth, Jan.9, 2003, no pet.) (same). Interactive's counterclaim for fraudulent inducement fails accordingly.

*3. Whether Recursion is Entitled to Summary Judgment on Interactive's Counterclaim for Breach of Implied Warranties*

 Interactive's counterclaims for breach of the implied warranties of merchantability and fitness for a particular purpose share the same fate. To succeed on its counterclaim for breach of the implied warranty of merchantability Interactive must establish that: 1) Recursion sold or leased a product to it; 2) the product was unmerchantable; 3) Interactive notified Recursion of the breach; and 4) Interactive suffered injury. *Polaris Indus., Inc. v. McDonald,* 119 S.W.3d 331, 336 (Tex.App.-Tyler 2003, no pet.). And an implied warranty of fitness for a particular purpose arises under Texas law when the seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." *Two Rivers Co. v. Curtiss Breeding Serv.,* 624 F.2d 1242, 1252 (5th Cir.1980). Regardless of whether Interactive has offered sufficient evidence to support its implied warranty claims (which it has not), those claims fail for the simple reason that implied warranties were effectively disclaimed by the license agreements.[16] The Voyager license agreements to versions 1.0.1, 2.0, and 2.01 each included the following disclaimer:

OBJECTSPACE, INC. DISCLAIMS AND MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT THE SUITABILITY OF VOYAGER(tm), EITHER EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON–INFRINGEMENT. OBJECTSPACE, INC. SHALL NOT BE LIABLE FOR ANY DIRECT OR CONSEQUENTIAL DAMAGES SUFFERED BY LICENSEE AS A RESULT OF USING, MODIFYING, OR DISTRIBUTING VOYAGER(tm) OR ITS DERIVATIVES.

(Pl.App.83, 85, 87). Texas law permits sellers to disclaim the implied warranties of merchantability and fitness for a particular purpose. *See* TEX. BUS. & COMM. CODE § 2.316(b).[17] For a disclaimer of implied warranties to be effective, it must be conspicuous. *Id.* According to the Texas Business and Commercial Code, a disclaimer is conspicuous

> when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: Non–Negotiable Bill of Lading) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color.

TEX. BUS & COMM. CODE § 1.201(10). The Court finds that a reasonable person ought

---

**16.** Interactive has wholly failed to respond to Recursion's argument that the disclaimers in the license agreements bar Interactive's counterclaims based on implied warranties.

**17.** The Court notes that the parties have not addressed the issue of whether the Texas Uniform Commercial Code applies to software licenses. The Court assumes that it does. *Cf. Bray Int'l, Inc. v. Computer Assocs. Int'l, Inc.,* 2005 WL 3371875, at *3 (S.D.Tex. Dec.12, 2005) (applying Texas UCC to software licenses where the parties did not dispute its appli-cation); *Hou–Tex, Inc. v. Landmark Graphics,* 26 S.W.3d 103, 108 n. 4 (Tex.App.—Houston [14th Dist.] 2000, no pet.) (noting that "at least one court and several academic commentators have concluded ... that software is a 'good' within the definition of the UCC."); *see also I. Lan Sys., Inc.,* 183 F.Supp.2d at 332 (assuming that UCC governs software licenses while noting that "technically" it does not); *NMP Corp. v. Parametric Tech. Corp.,* 958 F.Supp. 1536, 1542 (N.D.Okl.1997) (holding that Oklahoma UCC applied to software license agreement).

to have noticed the disclaimers contained in the Voyager license agreements, which were typed in all capital letters. *See Arkwright–Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.,* 844 F.2d 1174, 1183–84 (5th Cir.1988) (finding that contract properly disclaimed implied warranties of merchantability and fitness for a particular purpose). The license agreements themselves are relatively short, and it cannot be said that the disclaimers are not easily discernable or "buried" in mounds of verbiage. Because the Court finds that the implied warranties were effectively disclaimed, Recursion is entitled to summary judgment on Interactive's counterclaims for breaches of the implied warranties of merchantability and fitness for a particular purpose.

## C. Objections to Evidence

The Court has reviewed the various objections to and motions to strike evidence filed by the parties. Unless otherwise noted in this order, the Court overrules the objections for the reason that the evidence objected to either did not form a material basis for the Court's decision or that exclusion is otherwise not warranted at this stage. The Court specifically notes that Recursion's objections to Ganyo's statement read more like points for cross-examination than a basis for excluding the statement in its entirety. While the Court denies the parties' motions to strike evidence and overrules their objections for purposes of ruling on the cross motions for summary judgment filed by the parties, the parties may re-urge their evidentiary objections at trial.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS Interactive's Motion for Summary Judgment (doc. 81) in part and DENIES it in part. The Court DISMISSES Recursion's claims for unjust enrichment and quantum meruit. In all other respects, Interactive's Motion for Summary Judgment is DENIED. Recursion's Motion for Summary Judgment (doc. 85) is GRANTED in part and DENIED in part. The Court DISMISSES Interactive's counterclaims for fraudulent inducement and for breach of the implied warranties of merchantability and fitness for a particular purpose. In all other respects, Recursion's Motion for Summary Judgment is DENIED. To the extent not stated otherwise in this order, Plaintiff's Motion to Strike the Statement of Scott Ganyo (doc. 104) and Defendant's Motion to Strike Portions of Plaintiff's Supplemental Appendix (doc. 129) are DENIED and the objections to evidence lodged therein are OVERRULED without prejudice to being re-urged at trial. Plaintiff's Objections to Defendant's Summary Judgment Evidence (doc. 126) are OVERRULED without prejudice to being re-urged at trial. By separate order the Court will establish various pretrial deadlines and set this case for trial.

## SO ORDERED.

## *ORDER DENYING MOTION FOR RECONSIDERATION OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

Before the Court is Plaintiff Recursion Software, Inc.'s ("Recursion") Motion for Reconsideration of Plaintiff's Motion for Summary Judgment (doc. 140), filed March 10, 2006. Recursion asks the Court to enter partial summary judgment in its favor with respect to its claim that Defendant Interactive Intelligence, Inc. ("Interactive") breached the license agreement to Voyager 2.0.1. Recursion asserts that entry of partial summary judgment on that claim is proper because the Court "found" in its February 27, 2006 Memorandum Order that Recursion "established each element regarding liability on its first breach of contract claim." (Pl.'s Mot. Recon. at 1). Recursion misconstrues the Court's ruling. The Court did not "find"

that Recursion had *proved* its breach of contract claim for summary judgment purposes; rather, it concluded that Recursion had "submitted evidence on each element of" that claim. (Memorandum Order at 39). The Court stopped short of finding that Recursion had established its breach of contract claim in light of the existence of fact issues with respect to Interactive's affirmative defenses and with respect to Interactive's claim that Recursion's predecessor, Objectspace, had granted it a perpetual license to use the Voyager technology under then-existing license agreements that pre-dated the Voyager 2.01. license agreement. Although the Court appreciates that affirmative defenses are generally in the nature of "confession and avoidance", it finds that Recursion is not entitled to entry of partial summary judgment on its first breach of contract claim at this time. Recursion may renew its request after the presentation of evidence at trial. For now, Recursion's Motion for Reconsideration is DENIED.

**SO ORDERED.**